IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DARRELL ANTHONY WHITE WOODARD, | : |
| | : |
| *Plaintiff,* | : |
| | : Case No.:  2:23-CV-360 |
| v. | : |
| | : |
| YOUNG SCHOLARS OF WESTERN PENNSYLVANIA CHARTER SCHOOL and ISMAIL OZIS, in his individual and official capacity, jointly and severally, | : |
| | : |
| *Defendants.* | |

## COMPLAINT IN CIVIL ACTION

AND NOW, comes Plaintiff Darrell Anthony White Woodard, by and through the undersigned counsel, J.P. Ward & Associates, LLC, and, specifically, Joshua P. Ward, Esquire, who files the within Complaint against Defendants, Young Scholars of Western Pennsylvania Charter School and Ismail Ozis, of which the following is a statement:

## PARTIES

1. Plaintiff Darrell Anthony White Woodard, Ph. D., LPC, CADC ("Dr. Woodard" or "Plaintiff") is an adult individual who currently resides at 5356 Keeport Drive, Apartment 1, Pittsburgh, Pennsylvania 15236.

2. Defendant Young Scholars of Western Pennsylvania Charter School ("Defendant") is a domestic nonprofit corporation with a location at 600 Newport Drive, Pittsburgh, Pennsylvania 15234.

3. Defendant Mr. Ismail "Ike" Ozis ("Mr. Ozis") is the Head Principal and CEO of Defendant with an office located at 600 Newport Drive, Pittsburgh, Pennsylvania 15234.

## NATURE OF THE ACTION

4. This action arises under the Pennsylvania Whistleblower Law, the First and Fourteenth Amendment of the U.S. Constitution and 42 U.S.C. § 1983 and Common Law Wrongful Termination in violation of Commonwealth public policy.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331.

6. Plaintiff is a resident and citizen of Pennsylvania and a substantial number of the events or omissions giving rise to the claims occurred in Western Pennsylvania. Therefore, this action is within the jurisdiction of the United States District Court for the Western District of Pennsylvania and the venue is proper pursuant to 25 U.S.C. § 1391(b).

## FACTUAL ALLEGATIONS

7. Dr. Woodard initiated his employment with Defendant in or about March 2022 as Acting Dean of Students and was highly qualified for this position.

8. Defendant is a state funded charter school which receives its funding entirely from the Commonwealth.

9. Dr. Woodard was wrongfully terminated by Defendant for speaking on a matter of public concern in violation of his First Amendment rights to free speech.

10. While Dr. Woodard acted as a chief school administrator, there were at least three (3) incidents in a one-week span whereby teachers caused injury to children due to negligent supervision.

   a. **First incident of an injured student.**

11. A female student was found by a teacher on the ground injured following an assault.

12. The teacher who found the student informed Dr. Woodard and stated that he didn't see what happened.

13. Upon checking the camera, Dr. Woodard discovered that the student had been assaulted by a female student while the students were totally unsupervised.

14. Dr. Woodard recorded the first incident in the Infinite Campus database as required by school policy.

    **b. Second incident of an injured student.**

15. In the same week, a female student was found with a closed head injury.

16. The teacher who discovered the injured student reported the incident to Dr. Woodard and stated they did not know what happened.

17. Upon information and belief, the injured student had been assaulted by another student while totally unsupervised.

18. Dr. Woodard recorded the second incident in the Infinite Campus database as required by school policy.

    **c. Third incident of an injured student.**

19. On September 22, 2022, a young man was found on the playground with injuries to his head and brought to the school nurse.

20. The two teachers who were on the playground did not make a report about the incident.

21. The school nurse brought the injury to the attention of Dr. Woodard.

22. It was uncommon for the nurse to feel an incident was severe enough that it required the attention of the Dean of Students, but in this instance the nurse felt it necessary.

23. Upon investigation by Dr. Woodard, another student was alleged to have inflicted the injury.

24. The accused student denied the allegations.

25. Upon further investigation by Dr. Woodard, the teachers stated that they did not know anything about what caused the student's injury.

26. After the investigation, the injured student indicated that he had injured himself by accident.

27. Upon information and belief, the student was indeed assaulted, but stated the injury was self-inflicted to conclude Dr. Woodard's investigation. Upon information and belief, the student did this to avoid further retaliation and injury at the hands of fellow students and/or outside actors in the community.

28. The issue, again, was that the students were unsupervised.

29. Again, Dr. Woodard recorded the third incident in the Infinite Campus database as required by school policy.

30. Upon information and belief, neither of the teachers who failed to supervise the injured students were investigated and no corrective action was taken.

    **d. Dr. Woodard made reports in the Infinite Campus database and to school officials in compliance with his duty as a mandated reporter under the Education Discipline Act.**

31. Upon information and belief, Dr. Woodard's written reports were recorded in Infinite Campus and provided to the Department of Education.

32. Dr. Woodard was deeply troubled and concerned by the heightened frequency of injuries to students.

33. Dr. Woodard created these written reports of abuse and neglect in accordance with his affirmative duty and obligation to report abuse and neglect under the Education Discipline Act, Section 9a - Mandatory Reporting.

34. Additionally, Dr. Woodard reported these incidents via email to the Principal Ismail "Ike" Ozis, Assistant Principal Rob Furman and Chief Academic Officer Desiree Garcia.

35. In Dr. Woodard's investigation, he sought information about the incidents by sending emails around to teachers.

36. Dr. Woodard's written reports included allegations that Defendant was not being truthful and thorough in its investigations, despite having actual knowledge of the identities of the perpetrators of violence.

37. Under the EDA, a report of such conduct is mandated within fifteen (15) days of, inter alia, "(3.1) Information which constitutes reasonable cause to suspect that an educator has caused physical injury to a child or student as a result of negligence or malice."

38. Defendant retaliated against Dr. Woodard for making written reports. Indeed, once the reports were committed to written format, the Defendant was then mandated to report the incidents to the Pennsylvania Department of Education.

   **e. Immediately following Dr. Woodard's reports, school officials ambushed Dr. Woodard in a work performance meeting in retaliation for his reports and terminated his employment.**

39. Following Dr. Woodard's reports, on September 23, 2022, he was called into a meeting for "work performance" in which Defendant refused to address the issues raised in the reports.

40. Work performance meetings were typically scheduled ahead of time and held confidentially; however, this meeting was designed to ambush Dr. Woodard with no Human Resources representatives present.

41. Dr. Woodard stated in the so-called "work performance" meeting that he had no comment because he was not afforded the opportunity to have representation or due process. Mr. Ozis and the two other school officials in the meeting responded that he was being "belligerent."

42. In the meeting, Mr. Ozis refused to address Dr. Woodard's reports of wrongdoing and stated to him, "I'm the lead administrator in this building and I'm placing you on administrative leave."

43. Mr. Ozis stated that he did not have to address Dr. Woodard's reports and told Dr. Woodard he was in no position to demand a response.

44. Mr. Ozis also stated three times throughout the meeting, "I'm going to be nice to you and give you an opportunity to resign."

45. Further, Dr. Woodard was accused of "threatening another teacher" because he sent an email seeking information about the abuse and neglect causing injury to students. Mr. Ozis improperly characterized Dr. Woodard's investigation as a threat, however, Dr. Woodard was following protocol and Pennsylvania law. Dr. Woodard's inquiries and reports were protected activity, and he should have been immune from all retaliation.

46. Before these incidents occurred, in July 2022, Dr. Woodard previously spoke out against Mr. Ozis for saying that he was not going to enforce all of the rules in the handbook. Dr. Woodard stated to Mr. Ozis that was "going to be a problem."

47. After that confrontation, Dr. Woodard was retaliated against by not being allowed to contribute in weekly meetings and he was the only person who was required to supervise all four lunch periods.

48. Defendant took no investigative or corrective measures in response to Dr. Woodard's reports of negligence and injuries to students.

49. Dr. Woodard was never disciplined, written up or warned prior to his reports of negligent supervision resulting in the injuries of students.

50. Ultimately, Dr. Woodard was pretextually terminated from his position on September 27, 2022.

51. Following Dr. Woodard's termination, he contacted the Department of Education about the incidents via email but he received no response.

## PARTICIPATION THEORY
### Plead in connection with all Counts

52. Plaintiff incorporates the allegations contained in the paragraphs, above, as if fully set forth at length herein.

53. The Courts of this Commonwealth have long recognized the "participation theory", whereby, a corporate officer who participates in wrongful, injury-producing conduct can be personally liable, that is, individually liable for torts committed while acting within the scope of his or her employment by the corporation. *Loeffler v. McShane*, 539 A.2d 876 (Pa. Super. 1988); *Moy v. Schreiber Deed Sec. Co.*, 535 A.2d 1186 (Pa. Super. 1988); *Amabile v. Auto Kleen Car Wash*, 376 A.2d 247 (Pa. Super. 1977); *Tayar v. Camelback Corp. Inc.*, 957 A.2d 281 (Pa. Super. 2008).

54. An officer cannot shield himself or herself behind a corporation when he or she is an actual participant in the tort. *Donsco, Inc. v. Casper Corp.*, 587 F.2d 602 (3rd Cir. 1978).

55. Moreover, the fact that a corporation may be vicariously or secondarily liable under the doctrine of respondeat superior does not relieve the individual of his or her responsibility. An action against such individual may exist even though the agent or officer derived no personal benefit, but acted on behalf of, and in the name of, the corporation and the corporation alone was enriched by the act. *Shonberger v. Oswell*, 530 A.2d 112 (Pa. Super. 1987); *Kaites v. Com. of Pa. Dept. of Environmental Resources*, 529 A.2d 1148 (Pa. Commw. 1987).

56. There is a distinction between liability for individual participation in a wrongful act and an individual's responsibility for any liability-creating act performed behind the veil of a sham corporation; when the court pierces the corporate veil, the owner is liable because the corporation is not a bona fide independent entity and therefore its acts are truly the owner's, while under the participation theory, the court imposes liability on the individual as an actor rather than as an owner. *Shay v. Flight C Helicopter Services, Inc.*, 822 A.2d 1 (Pa. Super. 2003).

57. Defendant Ismail Oziz is the head administrator of Defendant Young Scholars of Western Pennsylvania.

58. Mr. Oziz was directly involved in the retaliation and wrongful termination of Plaintiff.

59. All of the causes of action in this case are statutory torts. The participation theory applies to statutory torts. See *Moy v. Schreiber Deed Sec. Co.*, 535 A.2d 1186 (Pa. Super. 1988)(holding that bank managers may be held jointly and severally liable if they participated in misleading activity that is found to violate the Pa. UTPCPL).

60. As such, Plaintiff is alleging joint and several liability among the individual and defendant organization, pursuant to the Participation Theory.

**COUNT I**
**RETALIATION AND WRONGFUL TERMINATION IN VIOLATION OF THE PENNSYLVANIA WHISTLEBLOWER LAW**

*(Plaintiff v. Young Scholars of Western Pennsylvania Charter School and Ismail Oziz, in his individual and official capacity, jointly and severally)*

61. Plaintiffs incorporate the allegations contained in the paragraphs, above, as if fully set forth at length herein.

62. The Pennsylvania Whistleblower Law (hereinafter "PWL") is "chiefly a remedial measure intended to enhance openness in government and compel the government's compliance with the law by protecting those who inform authorities of wrongdoing." *Saltzman v. Thomas Jefferson Univ. Hosps., Inc.*, 166 A.3d 465, 475 (Pa Super. 2017).

63. Under the PWL, 43 Pa. Stat. Ann. §§ 1421-1428, a "whistleblower" is "a person who witnesses or has evidence of wrongdoing or waste while employed and who makes a good faith report of the wrongdoing or waste, verbally or in writing, to one of the person's superiors, to an agent of the employer or to an appropriate authority." *Bailets v. Pa. Tpk. Comm'n*, 123 A.3d 300, 307 (Pa. 2015) (citing 43 Pa. Stat. Ann §1422).

64. Under the PWL, an employer may not "discharge, threaten, or otherwise discriminate or retaliate against an employee regarding the employee's compensation, terms, conditions, location, privileges or employment because the employee is requested by an appropriate authority to participate in an investigation, hearing, or inquiry held by an appropriate authority." 43 P.S. § 1423.

65. Under 43 P.S. §1423(b), "the reported wrongdoing must either be that of the employer or a violation of a law or code of conduct that the employer is charged to enforce for the good of the public." *Sea v. Seif*, 831 A.2d 1288, 1292 (Pa. Commw. Ct. 2003).

66. The PWL defines wrongdoing as "a violation which is not of a merely technical or minimal nature of Federal or State statute or regulation." 43 P.S. § 1422.

67. Under the PWL, an employer is "a public body" because it "receives money from a public body to perform work or provide services relative to the performance of work for or the provision of services to a public body: an individual, a partnership, an association, a corporation for profit, or a corporation not for profit." 43 P.S. §1422.

68. Although the Whistleblower Law applies only to employees of a "public body," that term has been broadly defined to include, in addition to state and local government, any other body "which is funded in any amount by or through Commonwealth or political subdivision authority or a member or employee of that body." See *Riggio v. Burns*, 711 A.2d 497, 500 (Pa. Super. 1998) (en banc) (receipt of government funds made hospital a "public body" under the Whistleblower Law).

69. Upon information and belief, Defendant receives public funds, both state and federal, thereby making it an employer of Plaintiffs as defined by the PWL.

70. Plaintiff is an employee as defined by the PWL.

71. Under the Education Discipline Act, 24 P.S. §§ 2070.1 *et seq.*, Plaintiff was a statutorily mandated reporter and was required to file a report with the Department of Education for "information which constitutes reasonable cause to suspect that an educator has caused physical injury to a child or student as a result of negligence or malice."

72. Upon witnessing the injuries to students as a result of the negligence of Defendant's staff members, Plaintiffs made several good faith reports to his supervisors as defined in the PWL.

73. Following Plaintiff's reports of wrongdoing, abuse, and neglect, Plaintiff was retaliated against in the form of being terminated from his position with no prior warning and pretextual reasoning.

74. Prior to Plaintiff's termination, he was subjected to retaliation and direct interference in performing his job duties, as set forth hereinabove.

75. As a direct and proximate result of the aforementioned conduct, Plaintiffs suffered actual damages, including, but not limited to, lost wages, benefits, loss of professional opportunities, harm to reputation, humiliation, mental anguish, and emotional distress, all in the past, present, and future.

WHEREFORE, Plaintiff hereby requests this Honorable Court consider the above and grant relief in Plaintiff's favor and against Defendant, including an award of back pay, front pay, compensatory damages, costs and reasonable attorney's fees, in addition to any such relief as deemed just and proper.

### COUNT II
### COMMON LAW WRONGFUL TERMINATION IN VIOLATION OF COMMONWEALTH PUBLIC POLICY

*(Plaintiff v. Young Scholars of Western Pennsylvania Charter School and Ismail Oziz, in his individual and official capacity, jointly and severally)*

76. Plaintiff incorporates the allegations contained in the paragraphs above as if fully set forth at length herein.

77. "[A]s a general rule, there is no common law cause of action against an employer for termination of an at-will employment relationship." *Mikhail v. Pennsylvania Org. for Women in Early Recovery*, 63 A.3d 313, 316 (Pa. Super. 2013).

78. However, under a narrow exception to this rule, an employee may bring a cause of action for termination if such termination would violate "a clear mandate of public policy" of the Commonwealth. *Reyes v. Termac Corp.*, CIV.A. 11-5124, 2012 WL 3517372, at *2 (E.D. Pa. Aug. 15, 2012) (citing *McLaughlin v. Gastrointestinal Specialists, Inc.*, 750 A.2d 283, 286 (Pa. 2000)).

79. "To state a cause of action under the public policy exception to the at-will employment doctrine, a plaintiff must point to a 'clear public policy articulated in the constitution, in legislation, an administrative regulation or a judicial decision.'" *Tanay v. Encore Healthcare, LLC*, 810 F.Supp.2d 734, 737 (E.D.Pa.2011) (quoting *Hunger v. Grand Cent. Sanitation*, 447 Pa.Super. 575, 670 A.2d 173, 175 (Pa. Super.1996)).

80. This public policy exception applies and permits a cause of action for wrongful discharge where the employer discharges an employee for refusing to commit a crime, where the employer discharges an employee for complying with a Statutorily imposed duty, or where the employer is specifically prohibited from discharging the employee by Statute. *Deal v. Children's Hosp. of Philadelphia*, 223 A.3d 705, 712 (Pa. Super. 2019) (citing *Greco*, 199 A.3d at 436; Stewart, 114 A.3d at 428).

81. As a "charter or cyber school," Defendant is a "school entity" as defined under the Education Discipline Act, Section 1(b).

82. As Acting Dean of Students, Plaintiff was a "chief school administrator" as defined under the Education Discipline Act, Section 1(b).

83. Under the Education Discipline Act, Section 9(a), "the chief school administrator or his designee shall file all of the information with the department in writing on a form prescribed by the department: (3.1) Information which constitutes reasonable cause to suspect that an educator has caused physical injury to a child or student as a result of negligence or malice."

84. Accordingly, Plaintiff was complying with his statutorily imposed duty as a mandated reporter of neglect of children and students under Section 9(a)(3.1) of the Education Discipline Act.

85. The injuries sustained by students caused by the negligent supervision of Defendant's staff constitute violations under the Education Discipline Act.

86. Additionally, under the Child Protective Services Law, 55 Pa. Code § 3490.13,

> (a) Required reporters who work in an institution, school, facility or agency shall immediately notify the person in charge of the institution, school, facility or agency or the person in charge's designee of suspected abuse. The person in charge, or the designee, shall be responsible and have the obligation to make a report of the suspected child abuse to ChildLine immediately. Nothing in this chapter requires more than one report from any institution, school, facility or agency.
>
> (b) The person in charge or the designee may not make an independent determination of whether to report. The person in charge or the designee shall notify the employe when the report was made to ChildLine.
>
> (c) Notwithstanding subsection (a), nothing in this chapter prohibits an employe who is a required reporter from making a report directly to ChildLine.

*Id.*

87. Additionally, under the Pennsylvania Crimes Code for Endangering Welfare of Children, 18 Pa. Code § 4304(a):

> (1)   A parent, guardian or other person supervising the welfare of a child under 18 years of age, or a person that employs or supervises such a person, commits an offense if he knowingly

endangers the welfare of the child by violating a duty of care, protection or support.

(2) A person commits an offense if the person, in an official capacity, prevents or interferes with the making of a report of suspected child abuse under 23 Pa.C.S. Ch. 63 (relating to child protective services).

(3) As used in this subsection, the term "person supervising the welfare of a child" means a person other than a parent or guardian that provides care, education, training or control of a child.

*Id.*

88. Therefore, Defendant was in violation of Commonwealth public policy when it terminated Plaintiff for complying with his statutorily imposed duty under the Education Discipline Act.

89. Defendant's purported reasoning for Plaintiff's termination was pretextual and done in retaliation for Plaintiff's reports of neglect of students.

90. Defendant's actions were knowing, intentional, reckless and done with conscious indifference to Plaintiff's rights.

91. As a direct and proximate result of the aforementioned conduct, Plaintiffs suffered actual damages, including, but not limited to, lost wages, benefits, loss of professional opportunities, harm to reputation, humiliation, mental anguish, and emotional distress, all in the past, present, and future.

WHEREFORE, Plaintiff hereby requests this Honorable Court consider the above and grant relief in Plaintiff's favor and against Defendant, including an award of back pay, front pay, compensatory and punitive damages, costs and reasonable attorney's fees, in addition to any such relief as deemed just and proper.

## COUNT III
### RETALIATION FOR SPEAKING OF A MATTER OF PUBLIC CONCERN IN VIOLATION OF 42 U.S.C. §1983 AND THE FIRST AMENDMENT OF THE UNITED STATES CONSTITUTION

*(Plaintiff v. Young Scholars of Western Pennsylvania Charter School and Ismail Oziz, in his individual and official capacity, jointly and severally)*

92.     Plaintiff incorporates the allegations contained in the paragraphs, above, as if fully set forth at length herein.

93.     Defendant retaliated against Plaintiff and terminated his employment because Plaintiff spoke as a citizen on a matter of public concern in violation of his rights to speak freely and to petition the government for redress of grievances violation of his rights to speak freely and to petition for the redress of grievances under the First and Fourteenth Amendment of the U.S. Constitution and 42 U.S.C. § 1983.

94.     Under Pennsylvania law, Defendant is required to protect the health, safety and well-being of children and students under its care and supervision.

95.     Defendant exercised control over the facility and the compliance with state laws, as it related to the protection of the health, safety and well-being of its students.

96.     Defendant, at all times relevant hereto, acted under color of state law, inasmuch as its acting constituted a misuse of power possessed solely by virtue of state law and made possible only because Defendant is and was clothed with the authority of state law.

97.     Plaintiff, as a citizen, has a right to speak on matters of public concern under the First and Fourteenth Amendments of the United States Constitution.

98.     As set forth above, Plaintiff was acting as a citizen both speaking upon matters of public concern and petitioning for redress of grievances, therefore, his speech and the action of

petitioning are protected under the First and Fourteenth Amendment of the United States Constitution.

99. Plaintiff had a duty, under Pennsylvania law and the Educator Discipline Act, to report neglect and abuse to the proper authorities. However, Plaintiff made numerous additional statements outside of those reports including statements to patients, superiors, co-workers, and members of the public.

100. Plaintiff, as a citizen of the United States, did not surrender his rights and privileges under the United States Constitution as a condition of employment with Defendant.

101. As described above, Defendant harassed, abused, and directly interfered with the job duties of Plaintiff in retaliation for his exercise of First and Fourteenth Amendment right to speak on matters of public concern and to petition for redress of grievances.

102. Further, Plaintiff was ultimately terminated for his exercise of First and Fourteenth Amendment right to speak on matters of public concern and to petition for redress of grievances.

103. Defendant's actions were knowing, intentional, reckless, and done with conscious indifference to Plaintiff's federally protected right to exercise their First Amendment rights.

104. The aforementioned conduct was a conscious choice on the part of Defendants to disregard Plaintiff's constitutional rights and deprived Plaintiff under color of state law, rights of speech, and petition under the First and Fourteenth Amendments of the U.S. Constitution in violation of 42 U.S.C. § 1983.

105. As a direct and proximate result of the above-mentioned breach, Plaintiff suffered actual damages, loss of income, lost wages, emotional distress, annoyance and embarrassment.

106. Plaintiff is seeking injunctive relief as set forth herein.

WHEREFORE, Plaintiff hereby requests this Honorable Court consider the above and grant relief in their favor as follows:

    a. That Defendant, in their official capacity be permanently enjoined from discriminating against Plaintiff for engaging in First Amendment Activities;

    b. That Defendant in their official capacity be permanently enjoined from retaliating against Plaintiff because they engaged in First Amendment protected activities;

    c. That Defendant in their official capacity, be ordered to reinstate Plaintiff to the position he occupied at the time he was terminated;

    d. That Defendant in their official capacity, be ordered to pay Plaintiff all lost pay and benefits;

    e. That Plaintiff be awarded against Defendant compensatory damages to compensate for pain, suffering, emotional distress and humiliation;

    f. That Plaintiff be awarded punitive damages against Defendant in an amount sufficient to punish Defendant and to deter similar conduct;

    g. That Plaintiff be awarded costs and attorney fees;

    h. That Plaintiff be awarded such other relief as deemed just and proper.

**JURY TRIAL DEMANDED.**

                                    Respectfully submitted,

                                    **J.P. WARD & ASSOCIATES, LLC**

Date: March 3, 2023                   By: */s/ Joshua P. Ward*
                                                Joshua P. Ward (Pa. I.D. No. 320347)
                                                J.P. Ward & Associates, LLC.
                                                The Rubicon Building
                                                201 South Highland Avenue
                                                Suite 201
                                                Pittsburgh, PA 15206

                                                *Counsel for Plaintiff*